# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Tom Johnson, | Case No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Patrick McCarver, in his individual and official capacity as an officer of the City of Minneapolis, John LaLuzerne, in his individual and official capacity as an officer of the City of Minneapolis, and the City of Minneapolis, | **JURY TRIAL DEMANDED UNDER 38(b)** |
| Defendants. | |

---

For his Complaint, Plaintiff Tom Johnson ("Johnson") hereby states and alleges as follows:

### Parties, Jurisdiction, and Venue

1.      This is an action for money damages for injuries sustained by Tom Johnson ("Johnson") as a result of violations of his constitutional rights by Defendants John LaLuzerne and Patrick McCarver, both of whom were acting in their individual and official capacities as Minneapolis police officers. LaLuzerne and McCarver's unreasonable seizure, false arrest and use of excessive force on Johnson, while acting under color of state law, violated Johnson's well-settled federal civil rights.

2.      While working an "off-duty" job at a Minneapolis nightclub called Seven on October 5, 2014, Defendants seized, tased and falsely arrested Plaintiff. As a result of the unconstitutional actions of the Defendants, Plaintiff was injured, jailed, publicly humiliated and ultimately forced to defend himself from criminal charges brought based on Defendants' false claims about Plaintiff's actions.  Although Plaintiff was acquitted by a jury following a one-week trial, he nonetheless suffered irreparable harm as a result.

1

3.     Plaintiff also asserts claims against the City of Minneapolis under *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658 (1978), as Defendant McCarver and LaLuzerne's improper seizure and use of unreasonable force on Johnson was enabled and directly caused by the custom or practice of the City of Minneapolis of deliberate indifference to the use of such unreasonable force and false arrests by McCarver, LaLuzerne and other Minneapolis police officers.

4.     Defendants McCarver and LaLuzerne's conduct in seizing, falsely arresting and using excessive force on Plaintiff on October 5, 2014, violated Plaintiff's well-settled federal civil rights to be free from unreasonable force and false arrest, all while acting under color of state law.

5.     Johnson brings his claims against the defendant officers in both their official and individual capacities.

6.     At all times relevant to this action, the City of Minneapolis was and is a duly incorporated municipal corporation under the laws of the State of Minnesota and was and is the employer and principal of the Defendants.

7.     Johnson brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the First and Fourth Amendments to the United States Constitution, the Minnesota Human Rights Act and 28 U.S.C. §§ 1331 and 1343(a)(3). The aforementioned statutory and constitutional provisions confer original jurisdiction of this matter to this Court.

8.     At the time of the use of unreasonable force and false arrest which is the subject matter of this Complaint, Plaintiff was a citizen of the United States and a resident of the State of Louisiana.

9.     At all material times, Defendants McCarver and LaLuzerne were citizens of the United States and residents of the State of Minnesota.

2

10.     Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(a)(3), which confer this Court with original jurisdiction in this matter.

11.     The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), excluding costs and interest.

12.     Plaintiff requests declaratory and injunctive relief in this action. He also seeks compensatory and punitive damages permitted by law, as well as statutory attorney's fees and expenses.

13.     Plaintiff demands a jury trial as to all issues of fact herein.

## Facts

14.     This case arises out of the "off-duty" employment of Officers McCarver and LaLuzerne at a downtown Minneapolis nightclub called Seven, located at 700 Hennepin Ave. in Minneapolis.

15.     "Off-duty" employment by Minneapolis police officers refers to instances in which private individuals or businesses hire Minneapolis police officers to provide additional policing in a particular area or for a particular event.

16.     The Minneapolis Police Department Policy and Procedure Manual, Section 3-800 sets forth the particular policies applicable to officers working "off-duty."

17.     Section II of the policy provides that "In all cases of off-duty employment the primary duty, obligation, and responsibility of an employee is to the City of Minneapolis and the MPD."

18.     While Minneapolis police officers were previously unable to engage in "off-duty" employment at establishments serving alcohol, approximately three to five years ago the MPD

3

changed its policy to allow officers to work for bars and other alcohol-serving establishments. (Trial Transcript, Vol. II, pp. 126-127).

19.    As soon as the policy changed to permit officers to work off-duty at bars, Defendant McCarver was granted permission to work off-duty at Seven. (Trial Transcript, Vol. II, p. 127).

20.    Defendant McCarver applied for permission to work at Seven because he knew the owner. (Trial Transcript, Vol. II, p. 127).

21.    Subdivision D, subsection 4 of the MPD Policy and Procedure Manual provides:

> Within the City of Minneapolis, officers are allowed to work at establishments, events or other premises where alcoholic beverages of any kind are served subject to the following conditions:
>
> a.    A minimum of two off-duty officers shall be working unless the precinct commander has determined a different minimum for a specific establishment.
> b.    The job site of off-duty officers is limited to the exterior of the establishment.
> c.    Off-duty officers shall not work in the capacity as a bouncer or screen patrons for admission or exclusion from the establishment.
> d.    Off-duty officers shall not enter the establishment except to respond to an emergency situation or to use the rest room.

22.    Defendants McCarver and LaLuzerne often worked Friday and/or Saturday nights at Seven, becoming known on a first name basis by Seven's non-MPD employees. (Trial Transcript, Vol. II, p. 86).

23.    On October 4, 2014, McCarver and LaLuzerne arrived at Seven around 10:30 p.m.

24.    Although MPD's policies required LaLuzerne and McCarver to remain outside Seven unless using the restroom or responding to an emergency, the officers spent the majority of the evening inside Seven. (Trial Transcript, Vol. III, pp. 20-21). In fact, Defendant McCarver

does not have any recollection of leaving Seven between 1:00 a.m. and 2:36 a.m., except to use his taser on Plaintiff.

25.     There was no emergency in Seven that night which would have required the Defendants to enter the establishment. (Trial Transcript, Vol. II, p. 91).

26.     Plaintiff is an African-American man who is a professional football player for the Minnesota Vikings. Prior to playing for the Vikings, Johnson obtained degrees in sports administration and business management from the University of Southern Mississippi, which he attended on a full scholarship for football. He began his professional career with the Indianapolis Colts, then played in the Canadian Football League for two seasons before returning to the NFL to play for the New Orleans Saints from 2011 to 2013.

27.     In 2014, Johnson signed a one-year free-agent contract with the Minnesota Vikings for the 2014 season.

28.     Johnson was new to Minnesota in October 2014, knowing few people outside the Vikings organization. Johnson officially resided in Louisiana at that time, but had a temporary residence in Minnesota, where he stayed while playing for the Vikings.

29.     Because the Vikings had a "bye week" on October 5, 2014 and were not playing a game, Johnson decided to meet a friend at Seven in downtown Minneapolis.

30.     Although Plaintiff was generally unfamiliar with downtown Minneapolis, he had previously been to Seven, as a Vikings teammate had hosted an event there. (Trial Transcript, Vol. IV, p. 75).

31.     At approximately 1:34 a.m. on October 5, 2014, while LaLuzerne and McCarver were inside Seven, Plaintiff arrived at the nightclub and entered through the front door. (Trial Transcript, Vol. IV, p. 72).

32.     Plaintiff utilized the valet service offered by Seven for its patrons, providing his keys to the valet and receiving a ticket in return. (Trial Transcript, Vol. IV, p. 73).

33.     Johnson, clad in a rugby-sleeved shirt, jeans, and tan Timberland boots, then proceeded to walk into Seven—right past Seven's chief doorman, Bryant Webster. (Trial Transcript, Vol. II, p. 100). Johnson did not indicate to Webster – or to anyone else that night – that he was a professional football player.

34.     Mr. Webster made no objection to Johnson's apparel or footwear at the time he entered Seven.

35.     Johnson went upstairs to Seven's second floor, because the third floor patio was closed due to the cool fall weather.

36.     While upstairs, Johnson saw two other Vikings players he knew and bought one round of drinks for the group. (Trial Transcript, Vol. IV, p. 79).

37.     Johnson, who is 6'3" and 285 pounds, consumed only one drink at Seven, a Crown Royal and ginger ale. (Trial Transcript, Vol. IV, pp. 79-80).

38.     At around 2:07 a.m., Johnson returned to the ground floor of Seven and walked outside to provide his ticket to the valet to retrieve his car. (Trial Transcript, Vol. IV, p. 81).

39.     Johnson gave his ticket to the valet, who indicated that it would be approximately 20 minutes before Johnson's car would be ready. (Trial Transcript, Vol. IV, p. 81).

40.     Because it was approximately 35 degrees that evening and Johnson was not wearing a coat, he returned inside to wait for his car in the front entryway area of Seven.

41.     At the time Johnson retuned inside, there were numerous other patrons remaining inside Seven.

6

42.     According to Bryant Webster, Seven staff members do not usually start telling patrons they need to leave the inside of the club until 2:15 a.m. (Trial Transcript, Vol. II, p. 44). The establishment usually closes its doors at 2:30 a.m., but often allows individuals waiting for their valets to wait inside the building. (Trial Transcript, Vol. II, p. 45).

43.     Johnson had never been to Seven at closing time and when he re-entered the establishment after asking the valet to retrieve his car, he was not instructed where to wait for his vehicle. However, allowing a patron to wait inside while the valet was retrieving a vehicle was the usual practice of Seven's employees. (Trial Transcript, Vol. II, pp. 64, 68).

44.     On October 5, 2014, video surveillance footage shows, in addition to Johnson, at least eleven other patrons were let into the building after the bar was closed.

45.     Johnson chose to wait approximately 5-6 feet from the exit, standing near the booths that line the windows along Hennepin Avenue. Nobody ever directed Johnson to stand elsewhere while waiting for his vehicle. (Trial Transcript, Vol. II, p. 110).

46.     After several minutes had passed, at 2:16 a.m., Johnson left the area he was standing to walk along the windows lining 7th Street to see if his car had been brought by Seven's valet service yet. (Trial Transcript, Vol. IV, pp. 85-86). After learning his vehicle was still not present, Johnson returned to the area near the door and began surfing the Internet on his phone. (Trial Transcript, Vol. IV, p. 86).

47.     While waiting for his car, Johnson was approached by Bryant Webster, who immediately told him he needed to leave.

48.     Johnson replied to Webster that he was waiting for the valet to retrieve his vehicle. Webster then told Johnson that his Timberland boots violated the club's unwritten dress

code, and therefore he had to leave. (Trial Transcript, Vol. IV, pp. 87-88). In fact, Johnson had previously worn the same boots to Seven without issue.

49.    Webster then asked Johnson who he was, to which Johnson replied "I'm nobody." (Trial Transcript, Vol. IV, p. 89).

50.    Feeling like he had been arbitrarily singled-out by Webster, Johnson explained that he was simply waiting for his car and asked Webster why all of the other patrons inside Seven were not also being asked to leave.

51.    After Webster walked away, Johnson returned to surfing the Internet on his phone and waited for his vehicle.

52.    During the time period when Webster confronted Johnson about his boots, Defendants McCarver and LaLuzerne were inside the bar.

53.    The officers were inside the bar at this time, despite McCarver's claims that off-suty police officers working at Seven would spend most of their time outside and that officers "don't work inside the bar," because they are "not allowed to do the security work." (Trial Transcript, Vol. II, p. 129).

54.    In fact, McCarver falsely reported he had not entered the establishment until 2:25 a.m. (Trial Transcript, Vol. II, p. 141).

55.    McCarver later admitted that he was violating MPD policy, but insisted that he was simply "trying to help the bar. They're paying us to get people out." (Trial Transcript, Vol. II, p. 129).

56.    After Johnson indicated he intended to remain inside the building while waiting for his car to be brought to the front by Seven's valet, Webster told Defendant McCarver, who was inside the establishment, that Johnson needed to "leave right now!"

8

57.    Because there was no lawful basis for Webster's request that Johnson leave the establishment, Webster did not indicate to the Defendants that there was any lawful basis for Johnson's removal, other than Webster's arbitrary request.

58.    In response to Webster's direction that Johnson be removed from the premises, Defendant McCarver approached Johnson, claiming that at the time McCarver was "working for the business" that night, and authoritatively told Johnson "to leave the bar right now," despite the fact that off-duty MPD officers cannot act in the capacity of a bouncer.

59.    McCarver claimed he was simply "doing what I'm asked to do" by Seven staff—and not acting within MPD policy— when he approached Johnson and asked him to leave. (Trial Transcript, Vol. II, p. 182). McCarver explained that he "didn't really think about it," he simply acted upon the command of Seven's head bouncer when he walked over to confront Johnson, wearing his full Minneapolis police uniform. (Trial Transcript, Vol. II, p. 182).

60.    When confronted by McCarver, Johnson calmly indicated that he intended to wait inside until his car was present, pointing out that the officers had not asked any of the other patrons waiting inside Seven to leave. (Trial Transcript, Vol. IV, p. 90). Johnson also showed McCarver his valet ticket. (Trial Transcript, Vol. IV, p. 94).

61.    Defendant LaLuzerne, who had already been inside the building for hours that night, but who falsely claimed he had entered the building only when "the business was closed" and "went in to see why the people were still inside," watched Defendant McCarver approach Johnson, having previously heard Webster tell Johnson "something about him being nice enough to let Johnson in and this was how he was going to repay him."

62.    LaLuzerne never heard Webster actually ask Johnson to leave, but merely "assumed" he had. (Trial Transcript, Vol. III, p. 85).

9

63.     Without articulating any legitimate basis for using force on Johnson, and without having any legal justification for using force on Johnson, Defendant McCarver then began pushing Johnson, who was only feet from the door, while LaLuzerne stood nearby.

64.     Johnson asked McCarver why he was touching him, as he had not done anything. (Trial Transcript, Vol. IV, p. 92).

65.     While Johnson was in the process of requesting an explanation from McCarver, Johnson began backing up the short distance to the front door of Seven, feeling corralled by the officers.

66.     In contrast to the claims made by the Defendants in their false police reports, video confirms Johnson was at that time "retreating" to the exit, "walking backwards" away from the two officers. (Trial Transcript, Vol. IV, pp. 96-97).

67.     At no time that night, did Johnson ever shove, slap or swing at anyone and he posed no threat to the Defendants.

68.     Moreover, while the officers were forcing Johnson out of a building where he was lawfully entitled to be, Johnson was never told he was trespassing or that he would go to jail, as he waited inside for his vehicle. (Trial Transcript, Vol. IV, pp. 103-104).

69.     After having walked backwards to the door while surrounded by LaLuzerne, McCarver and various other Seven employees, Johnson began to open the door to leave.

70.     At that time (2:18 a.m.), and without warning, Defendant McCarver sprayed Johnson, who was backing out the exit, in the face with his MPD-issued chemical irritant, also known as "mace" or "pepper spray." (Trial Transcript, Vol. III, p. 20; Trial Transcript, Vol. IV, p. 97). Because Johnson had already begun opening the door, a draft of incoming air caused the mace to blow back into the building onto Defendant LaLuzerne and others.

10

71.    According to MPD policy 5-313, "officers shall avoid spraying persons directly in the eyes if possible. Officers will render appropriate first aid to individuals that have been exposed to chemical aerosols/agents in order to decontaminate them as quickly as possible. This could include exposing the affected person to fresh air, rinsing the eyes/skin with water if available and/or having them evaluated by medical personnel prior to transport. When chemical aerosols/agents are used, the involved subject shall be kept under close observation until they are released to medical or other law enforcement personnel who shall be informed that a chemical agent/aerosol was used."

72.    Both of the defendant officers failed to comply with this policy.

73.    After being sprayed in the face with the chemical irritant without any cause or justification, Johnson turned around to face the street, walking forward as he exited Seven. As it is intended to do, the chemical irritant was highly inflammatory, forcing Johnson to close his eyes. Moreover, Johnson's nose was running and he was "spitting up." (Trial Transcript, Vol. IV, p. 99).

74.    Johnson felt his way along the exterior of the building, unable to see, with snot running from his nose.

75.    At 2:26 a.m., while Johnson was attempting to regain his vision, a Seven employee brought Johnson a glass of water and a towel to help remove the irritant. (Trial Transcript, Vol. IV, p. 100). At no time did either of the defendant officers provide any assistance to Johnson, despite using a chemical irritant on him.

76.    Eventually, Johnson was able to sit down "in disbelief" on a large concrete planter on the sidewalk outside the front doors of Seven. (Trial Transcript, Vol. IV, p. 101).

11

77. To demonstrate his gratitude to the Seven employee who had brought him water and a towel, Johnson walked to the front door of Seven at 2:28 a.m. and handed the employee a $60.00 cash tip. (Trial Transcript, Vol. IV, p. 101).

78. As Johnson was tipping the employee who aided him, Defendant McCarver approached the pair, and Johnson asked McCarver his name and then utilized his phone to take a photo of McCarver at 2:29 a.m. (Trial Transcript, Vol. IV, p. 105).

79. At 2:32 a.m., Johnson returned to sit on the planter. (Trial Transcript, Vol. IV, p. 105). While sitting on the planter, Johnson also realized he would be unable to drive his vehicle due to his irritated eyes.

80. At 2:35 a.m., Johnson made a call to a car service that would send two drivers to pick up Johnson and his vehicle and return them safely home. (Trial Transcript, Vol. IV, pp. 105-106).

81. However, because it was a busy night for the car service, Johnson was forced to wait, continuing to sit on the planter outside of Seven as he did so.

82. After McCarver and LaLuzerne concluded that Johnson, as was his legal right, was taking photos of the officers from the sidewalk (Trial Transcript, Vol. II, p. 164), McCarver and LaLuzerne "agreed" amongst themselves that Johnson "was going to be placed under arrest and go to jail."

83. At approximately 2:35 a.m., Johnson saw Defendant McCarver inside Seven, walking to the exit. (Trial Transcript, Vol. IV, p. 115).

84. At that time, Johnson began recording with his iPhone, which Defendant LaLuzerne saw.

12

85.     Minneapolis Police Department training materials instruct officers that "a citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital and well-established liberty safeguarded by the First Amendment."

86.     MPD furthers instructs its officers, "Please do not take cameras and cell phones from people when they are recording you in the performance of your duties."

87.     Defendants ignored this instruction in its entirety.

88.     LaLuzerne and McCarver claimed they "decided to arrest Mr. Johnson because he was still standing outside," even though at the time Johnson was on the public sidewalk outside the nightclub, waiting for the car service, and had done nothing wrong. (Trial Transcript, Vol. III, p. 125).

89.     Defendant McCarver exited the building with Defendant LaLuzerne at 2:36:41 a.m. and headed directly toward Johnson. (Trial Transcript, Vol. IV, p. 116).

90.     Johnson, who at the time was recording the scene with his iPhone, asked McCarver "you feel good about it?"

91.     Defendant McCarver immediately asked Johnson for identification. McCarver did not indicate that Johnson was under arrest, as there would have been no legitimate reason to place Johnson under arrest.

92.     Among other reasons, MPD training provides that officers cannot arrest people for trespassing when the person is on a public sidewalk.

93.     When confronted on the sidewalk by Defendant McCarver, Johnson responded that he did have his ID, but had not done anything wrong.

94.    At 2:36:45, just 4 seconds after walking outside, Defendant McCarver swatted Johnson's phone out of his hand, which caused it to stop recording, as McCarver intended. (Trial Transcript, Vol. IV, p. 116).

95.    Johnson, who was still seated on the planter at the time McCarver knocked the the phone out of his hand, stood up to pick up his phone and then bent down to retrieve it, finding that it had shattered as a result of McCarver's action. Johnson then sat back down. (Trial Transcript, Vol. II, p. 166).

96.    At 2:36:48, Defendant McCarver aimed the red dot of his department-issued taser at Johnson. (Trial Transcript, Vol. IV, p. 117). In fact, as Johnson was bending down to pick up his shattered cell phone, Defendant McCarver had the red dot of the taser aimed right at Johnson's head.

97.    Under MPD policy 5-318, "officers should announce over the radio that they are going to deploy the Taser." McCarver failed to do this.

98.    In addition, MPD policy 5-318 requires that "officers actually firing the Taser should yell "TASER!" prior to and/or during firing." McCarver failed to do this.

99.    Although there was no lawful reason to utilize a taser on Johnson, who was seated on the planter and who posed no threat to Defendants or anyone else, at 2:36:53, Defendant McCarver fired his MPD-issued taser at Johnson's back, without warning, ultimately deploying it for a total of 14-17 seconds. (Trial Transcript, Vol. III, p. 28; Trial Transcript, Vol. IV, p. 117).

100.    Though tasers are typically supposed to fire for only 5 seconds, McCarver kept the trigger pulled and the taser firing for much longer. (Trial Transcript, Vol. II, p. 169). In fact, McCarver later admitted to doubling the amount of time he tased Johnson on purpose. (Trial Transcript, Vol. III, p. 29).

14

101.    According to Defendant McCarver's personnel records, he had fired a taser 470 times previously in his MPD career and he had never previously fired the taser for as long as he did with Johnson. In fact, in 468 out of the 470 times Defendant McCarver had previously fired the taser, he fired it for five seconds or less.

102.    As a result of being tased for 14-17 seconds, Johnson felt "instant pain in [his] back." The pain was so severe that Johnson screamed aloud. (Trial Transcript, Vol. IV, p. 108).

103.    Johnson was immobilized by the electricity pulsing through his body, which made it impossible to struggle. In fact, Johnson posed no threat whatsoever to the Defendants.

104.    Johnson was then forcibly taken to the ground by Defendants, causing injuries to him in the process, and was handcuffed behind his back.

105.    Although he had still done nothing wrong and had committed no crime to justify a custodial arrest, Johnson was taken by van to the Hennepin County Adult Detention Center, where a mugshot was taken and Johnson was placed in a jail cell.

106.    MPD policy provides that, when working off-duty, officers "shall contact the on-duty supervisory staff of the precinct where they are performing their off-duty employment for probable cause authorization."

107.    Prior to Johnson's custodial arrest, Defendants McCarver and LaLuzerne failed to make any attempt to contact on-duty supervisory staff to gain probable cause authorization prior to arresting Johnson.

**Defendants Fabricate A Story To Legitimize Their Unconstitutional Actions**

108.    As both defendant officers have done several times in the past in efforts to cover up their unconstitutional misconduct, McCarver and LaLuzerne falsely reported that Johnson

was aggressive towards them, among other false statements and exaggerations in their supplemental reports.

109.    For example, among other lies in his written supplement, Defendant McCarver wrote that "Johnson swung his arm around, pushing my hand/arm away from him…" after McCarver initially became physical with Johnson while inside Seven.

110.    At the criminal trial Johnson was forced to endure in June of 2015, McCarver expanded upon this lie, claiming Johnson came at him with his "fists up," although he did not use the term "fists" in his written report. (Trial Transcript, Vol. II, pp. 159, 182).

111.    Defendant LaLuzerne likewise indicated – falsely - in his report that Johnson was "hitting/swinging at his (LaLuzerne's) arms."

112.    Johnson never swung his arms, punched, slapped or struck anyone on October 5, 2014.

113.    The statements of McCarver and LaLuzerne were demonstrably false and were intended as justifications for their unconstitutional actions committed against Johnson. Security footage of the interaction between Johnson and the Defendants confirms that Johnson made *no aggressive movements* toward the officers whatsoever.

114.    However, Defendant McCarver insisted that, while the officers were initially cornering Johnson inside Seven, "Johnson stood his ground and would not go out the door, and continued knocking LaLuzerne's hands away from him." Defendant LaLuzerne also falsely reported that Johnson was swinging at his arms, as LaLuzerne attempted to push Johnson by his chest.

115.    Although Johnson was never told he was - or could be - under arrest while he was inside Seven, Defendant McCarver wrote in his report that he and Defendant LaLuzerne yelled in unison that Johnson was being arrested for "TRESPASSING!"

116.    After Johnson was maced and relegated to the street, Defendants again lied in their official reports about what happened on the sidewalk—creating a fiction out of whole cloth, based on a lie in which they falsely claimed Johnson climbed atop a concrete planter to attack the officers.

117.    Moreover, McCarver's report failed to mention that he knocked Johnson's phone from his hands while Johnson was recording his actions, which would have violated MPD policy.

118.    Instead, McCarver claimed he did not "recall what exactly" he said upon approaching Johnson, "because [he] wasn't able to finish [his] statement," writing that he reached down to take hold of Johnson's right arm with his left hand, with his taser in his right hand, claiming "Johnson jerked his arm away from me and jumped up in my face."

119.    Despite the clear evidence that, in fact, Johnson took no such action, McCarver reported he "thought [Johnson] was attacking" him.

120.    As Defendants knew, under the test of "objective reasonableness" to measure police use of force, an officer's subjective beliefs about what was happening are irrelevant. *Shekleton v. Eichenberger*, 677 F.3d 361, 364 n.4 (8th Cir. 2012).

121.    For his part, Defendant LaLuzerne insisted Johnson stepped forward toward him, although no such movement can be seen on the surveillance footage and, in fact, did not occur. (Trial Transcript, Vol. III, p. 93).

122.    Defendant LaLuzerne also claimed that as he attempted to grab Johnson's elbow, "Johnson sprang to his feet." LaLuzerne claimed that he "felt sure that [Johnson] was now going to fight us," and that Johnson then "stepped back and up onto the planter he had been sitting on."

123.    McCarver also falsely reported that "Johnson stepped onto the planter and faced Officer LaLuzerne," and, after being tased by McCarver, that Johnson had implausibly "walked across the planter, and was stepping down toward Officer LaLuzerne…swinging at Officer LaLuzerne's arms or body."

124.    These statements were demonstrably untrue and were fabricated by McCarver in an effort to justify the unconstitutional actions of the Defendants and, later, to provide a basis for a criminal prosecution of Johnson which McCarver and LaLuzerne believed would prevent Johnson from filing a civil lawsuit against them.

125.    Even despite the video evidence, McCarver testified to a similar fiction at trial, falsely claiming Johnson "had jumped on top of the planter and had walked over towards LaLuzerne and stepped down to the step of the planter and was stepping down towards Officer LaLuzerne and they were – Officer LaLuzerne was trying to grab his arm it looked like, and he was kind of pushing at him, the same thing he had done inside." (Trial Transcript, Vol. II, p. 167).

126.    Defendant LaLuzerne claimed he "reached up for Johnson's left arm to pull him off the planter," and that Johnson "lunged down toward him."

127.    LaLuzerne's claims, both in his sworn testimony and in his report, were lies.

128.    Defendant McCarver repeated those lies, claiming he tased Johnson "to stop his assault on LaLuzerne," although no such assault occurred, nor would any reasonable officer have believed such an assault to be imminent.

129.    In fact, the video surveillance footage confirms that Johnson never stepped on the planter. (Trial Transcript, Vol. IV, p. 113).

130.    In contrast to the reports of aggression in the reports and testimony of the Defendants, surveillance footage shows Defendant McCarver tasing Johnson while Johnson **was seated on the planter**, even though Johnson **had not been told he was under arrest**; had not committed any crime; had never set foot atop the planter; and **had not made any aggressive movement** toward the defendant officers.

131.    After being tased, Defendants claimed that Johnson, who was tased for significantly longer than recommended and reported he had difficulty breathing, "did not comply" when asked to put his hands behind his back.

132.    After being confronted with video footage of the encounter with Johnson, Defendant LaLuzerne admitted he had actually never seen Johnson "swing at anybody." (Trial Transcript, Vol. III, p. 113).

### Johnson Was Forced to Defend Himself in Court Against Charges Brought Based on the Defendants False Accounts, With Significant Economic Consequences

133.    After being tased, Johnson was handcuffed and taken to jail.

134.    The false police reports made by the Defendants in an effort to conceal their own misconduct resulted in criminal charges being filed against Johnson for crimes that he did not commit, and which no reasonable officer would have believed Johnson had committed.

135.    Because he is a public figure, Johnson's arrest was reported in various local and national publications and his mugshot was displayed on various websites, causing him embarrassment, humiliation and professional harm.

136.    In addition, Johnson was forced to expend legal fees in the amount of $50,000 to hire a criminal defense lawyer to defend himself from the false, unconstitutional charges which Defendants' false police reports set in motion.

137.    After a five-day jury trial in June of 2015, a jury took only fifteen minutes to acquit Johnson of all charges against him.

138.    In addition to suffering the indignity of being falsely arrested and put in jail – and the consequent economic loss he sustained as a result of that arrest – Johnson suffered lacerations and bruising, burns from the taser, emotional distress, pain, suffering, humiliation, and a loss of liberty without arguable probable cause or a reasonable articulable suspicion.

139.    The false arrest and other constitutional violations committed by Defendants McCarver and LaLuzerne also had a significant and detrimental impact on Plaintiff's ability to earn money as a professional football player.

140.    Plaintiff's on-field performance during the 2014-15 season for the Minnesota Vikings put him in position for a significant raise in pay.

141.    During the 2014-15 season, Plaintiff had 6.5 sacks while playing defensive tackle, one of the highest totals in the NFL for his position. In fact, following the 2014 football season, Johnson was ranked as the 23rd best defensive tackle in the NFL, as ranked by an independent ratings service.

142.    Because he was a free agent, Johnson was able to sign a contract with any team in the NFL following the 2014-15 season. However, other NFL teams which may have been interested in Plaintiff were deterred because of his pending criminal case, which potentially subjected him to suspension by the NFL, as well as potentially bringing unwanted negative

publicity to any NFL team which would have otherwise wanted to sign Johnson while criminal charges against him were still pending.

143.    Among other negative consequences which resulted from the unconstitutional actions of the Defendants in arresting Johnson on October 5, 2014, Plaintiff was placed in the "the NFL Intervention Program," which subjected him to additional league punishment, including suspension from the NFL.

144.    Because of his placement in that program, Plaintiff was required to be evaluated by a medical director from the NFL, was required to attend counseling services, was (and is) subject to substance abuse testing, and was (and is) subject to further, enhanced punishments from the NFL, including suspension.

145.    Due to the fact that Johnson was falsely arrested by Defendants, leading to criminal charges against him for crimes he did not commit – and due to his subsequent placement in the NFL Intervention Program – Plaintiff was severely handicapped in his negotiations with other NFL teams, as he sought a new free-agent contract in the spring of 2015 (which is when the NFL's free-agency signing period occurs).

146.    Because of the impact of the false claims made by the Defendants and the resulting criminal charges pending against him, Plaintiff was left with no negotiating leverage and ultimately re-signed with the Vikings on March 8, 2015.  Although his new contract could potentially pay him $7 million over three years, that amount was significantly less than his market value at the time, if he was not facing criminal charges and a possible NFL suspension if he was convicted of those charges.

147.    In fact, Plaintiff could have reasonably expected a contract paying him significantly more than $7 million over three years after his successful 2014-15 season.

148.    Numerous other defensive tackles who were free agents at the same time as Johnson – but who were not facing false criminal charges and/or a potential suspension from the NFL - signed more lucrative free-agent contracts than Johnson did.  For example, the following free-agent defensive tackles all signed contracts in the 2014-15 off-season which were valued in excess of Plaintiff's 3-year, $7 million contract:

> Jared Odrick 5 years, $42.5 million
> Dan Williams 4 years, $25 million
> Steven Paea 4 years, $21 million
> Corey Peters 3 years, $10.5 million
> Vince Wilfork 2 years, $9 million
> Ricky François 3 years, $9 million
> Randy Starks 2 years, $8 million

149.    Following the incident with Johnson in October of 2014, Defendants McCarver and LaLuzerne both received accolades from the MPD.

150.    In February 2015, McCarver and LaLuzerne both received a Department Award of Merit.

151.    In addition, Defendant LaLuzerne was promoted to Sergeant in May 2015, just months after this incident.

152.    Defendants McCarver and LaLuzerne are friends and have worked closely together in the Minneapolis Police Department, including as partners, for many years.

153.    Prior to the incident with Johnson, Defendants McCarver and LaLuzerne have both been the subjects of prior claims alleging the use of unreasonable force and discriminatory conduct.  Among other claims against Defendants, a man named Malcolm Labon alleged McCarver and LaLuzerne falsely arrested and used unreasonable force on him and discriminated against him based on race. In December of 2011, the City of Minneapolis paid $45,000 to Labon to settle the claims against Defendants McCarver and LaLuzerne.

22

154.    An earlier lawsuit against Defendant McCarver alleging he unconstitutionally arrested and maced a man named Kamyar Farahan, who also claimed discrimination, was resolved by payment of $90,000 to Mr. Farahan in 2005.

## COUNT I – CIVIL RIGHTS VIOLATIONS AGAINST DEFENDANTS McCARVER AND LaLUZERNE UNDER 42 U.S.C. § 1983

155.    Plaintiff realleges and incorporates herein by reference the allegations in the preceding paragraphs of this Complaint as if set forth herein in their entirety.

156.    By the actions described above, Defendants McCarver and LaLuzerne, under color of state law, violated and deprived Plaintiff of his clearly established and well-settled civil rights to be free from excessive force, false arrest and unreasonable seizure.

157.    Defendants McCarver and LaLuzerne deprived Plaintiff of these rights either maliciously or by acting with reckless disregard for whether Plaintiff's rights would be violated by his actions.

158.    Defendants McCarver and LaLuzerne's actions were objectively unreasonable pursuant to *Graham v. Connor*, 490 U.S. 386 (1989).

159.    At the time Defendants McCarver and LaLuzerne seized, tased and arrested Johnson, Plaintiff posed no threat to the safety of the Defendants, himself or others.

160.    Plaintiff never actively resisted arrest nor attempted to evade arrest by flight.

161.    Plaintiff was not the legitimate suspect of any criminal activity when the Defendants seized, tased and falsely arrested him. Because Johnson was compliant and had not committed any crimes, there was no legitimate law enforcement purpose for the use of any force against him at all.

162.    The facts known to the Defendants and observed on the scene did not give them arguable probable cause to believe a crime had been committed, much less an offense which would have justified a custodial arrest.

163.    Despite the fact that a reasonable officer would have known there was no probable cause to make a custodial arrest of Johnson, Defendants arrested Johnson, which was therefore constitutionally unreasonable.

164.    The force used against Johnson, to wit: pushing, pepper spraying, tasing, forcing him to the ground and handcuffing him, was all excessive and unreasonable as a matter of law.

165.    Defendants McCarver and LaLuzerne also violated the Fourth Amendment by detaining Johnson without a reasonable, articulable suspicion to believe he had committed, or was about to commit, any crime.

166.    Separate and apart from the false arrest and use of force on Plaintiff, Defendants' unreasonable *Terry* stop constituted an unreasonable and illegal seizure under 42 U.S.C. § 1983.

167.    Defendants also violated Johnson's due process rights by intentionally fabricating their police reports and testimony to include statement about Johnson's conduct that were objectively false – as demonstrated by the surveillance video of the incident - as part of a post-*hoc* attempt to justify their unlawful arrest and use of force on Johnson and to prevent him from filing a civil lawsuit against them.

168.    As a direct and proximate result of the acts and omissions of Defendants McCarver and LaLuzerne, Plaintiff was unlawfully seized, tased and falsely arrested, suffered great bodily and mental harm, both past and future, past and future economic loss, legal fees for criminal defense services, and other items of damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

169.    Punitive damages are available against Defendants McCarver and LaLuzerne and are hereby claimed as a matter of right under federal common law, *Smith v. Wade,* 461 U.S. 30 (1983), and therefore are not subject to the pleading standard set forth in Minn. Stat. § 549.20.

170.    Plaintiff is entitled to recovery of his costs, including reasonable attorney's fees, under 42 U.S.C. § 1988.

## COUNT II – DEFENDANT CITY OF MINNEAPOLIS CIVIL RIGHTS VIOLATIONS

171.    Plaintiff realleges and incorporates herein by reference the allegations in the preceding paragraphs of this Complaint as if set forth herein in their entirety.

172.    As of October 5, 2014, Defendant City of Minneapolis maintained a custom and practice of deliberate indifference to the use of excessive force, false arrest and unreasonable seizure by its officers, including Defendants McCarver and LaLuzerne.

173.    Prior to October 5, 2014, the City of Minneapolis, with deliberate indifference to the rights of those within its jurisdiction, initiated, tolerated, permitted, failed to correct, promoted, and/ or ratified a custom, pattern, or practice on the part of its officers, including Defendants McCarver and LaLuzerne, of the use of excessive force, false arrest and unreasonable seizure in violation of the United States Constitution.

174.    Upon information and belief, there have been numerous complaints and lawsuits filed against Defendants McCarver and LaLuzerne wherein it has been alleged, in part, that they used excessive or unreasonable force or falsely arrested the complainant.

175.    Prior to October 5, 2014, Defendant City of Minneapolis, with deliberate indifference to the rights of those within its jurisdiction, continued to employ Defendants

McCarver and LaLuzerne as police officers despite notice that they had repeatedly used excessive force, false arrest and unreasonable seizure.

176.    Through the City of Minneapolis' ratification and approval of its officers' actions, in both this case and others, and by failing to discipline its officers, including Defendants McCarver and LaLuzerne, there has been a policy, custom, or practice of the use of excessive force, false arrest and unreasonable seizure without sanction or consequence.

177.    Through its failure to take corrective or remedial measures or to punish or deter Defendants McCarver and LaLuzerne from using excessive force, false arrest and unreasonable seizure, the City's actions had the effect of condoning and/or ratifying Defendants McCarver and LaLuzerne's use of unconstitutional actions, which directly caused the unconstitutional arrest and use of force on Plaintiff on October 5, 2014.

178.    Moreover, by giving Defendants McCarver and LaLuzerne various awards and commendations for their actions, the City further ratified their unconstitutional actions.

179.    The constitutional deprivations suffered by Plaintiff were directly and proximately caused by the aforementioned acts and omissions and by the City's customs, patterns, and/ or practices, and the City of Minneapolis is thereby liable in an amount to be determined by the jury.

180.    As a direct result of the acts and omissions, systematic flaws, policies, and customs of Defendant City of Minneapolis, Plaintiff's constitutional rights were violated and he was forced to endure pain and mental suffering, and was thereby damaged as described herein, in an amount to be determined by the jury, in excess of Seventy-Five Thousand ($75,000) Dollars.

181.    Plaintiff is entitled to recovery of his costs, including reasonable attorney's fees, under 42 U.S.C. § 1988.

## COUNT III – DEFENDANTS McCARVER AND LaLUZERNE
## 42 U.S.C. § 1983 FIRST AMENDMENT VIOLATIONS

182.    Plaintiff realleges and incorporates herein by reference the allegations in the preceding paragraphs of this Complaint as if set forth herein in their entirety.

183.    The First Amendment establishes the public's right to record police officers in the performance of their official duties, "subject to reasonable time, place, and manner restrictions." *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011).

184.    At the time Plaintiff was recording and/or photographing the Defendants on October 5, 2014, he was in a public location, peaceably recording officers who had just sprayed him with pepper spray without justification.

185.    Plaintiff was exercising his First Amendment right to record the officers in this fashion.

186.    Nonetheless, Defendant McCarver forcibly removed Plaintiff's recording device from his hand, slapping it to the ground, causing it to stop recording.

187.    Defendant McCarver was aided and encouraged by Defendant LaLuzerne, who also approached Plaintiff after learning he was recording, intending to arrest him.

188.    As a direct and proximate result of Defendants McCarver and LaLuzerne's actions, Plaintiff's First Amendment rights were violated and he was thereby damaged in an amount to be determined, but well in excess of amount Seventy-Five Thousand ($75,000) Dollars.

189.    Punitive damages are available against Defendants McCarver and LaLuzerne and are hereby claimed as a matter of right under federal common law, *Smith v. Wade,* 461 U.S. 30 (1983), and therefore are not subject to the pleading standard set forth in Minn. Stat. § 549.20.

27

190.    Plaintiff is entitled to recovery of his costs, including reasonable attorney's fees, under 42 U.S.C. § 1988.

## COUNT IV - RACE DISCRIMINATION IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

191.    Plaintiff realleges and incorporates herein by reference the allegations in the preceding paragraphs of this Complaint as if set forth herein in their entirety.

192.    The aforementioned actions of Defendants McCarver and LaLuzerne, in their individual and official capacity as Minneapolis police officers, evidences discrimination against Johnson in the area of public services on the basis of his race.

193.    The conduct of Defendants was so at variance with what reasonably would have been anticipated that race discrimination is the most likely explanation for it.

194.    The discriminatory conduct of Defendants McCarver and LaLuzerne was intentional, deliberate, willful, and undertaken with callous disregard for, and gross indifference to, Plaintiff's rights.

195.    By virtue of the conduct described above, Plaintiff has suffered discrimination, embarrassment, emotional distress, humiliation, indignity, injury, and other losses as set forth in the preceding paragraphs.

196.    Plaintiff is entitled to recover all amounts owing under the Human Rights Act, including liquidated damages for McCarver's and LaLuzerne's willful violation of the Act.

197.    Plaintiff is also entitled to recovery of his costs under the Human Rights Act, including reasonable attorney's fees,

## COUNT V – DEFENDANTS McCARVER AND LaLUZERNE
## FOURTEENTH AMENDMENT VIOLATIONS

198.    Plaintiff realleges and incorporates herein by reference the allegations in the preceding paragraphs of this Complaint as if set forth herein in their entirety.

199.    By the actions described above, Defendants McCarver and LaLuzerne, under color of state law, violated and deprived Plaintiff of his clearly established and well-settled due process rights.

200.    The Fourteenth Amendment's guarantee of due process is violated by "the manufacture of . . . false evidence" in order "to falsely formulate a pretense of probable cause." *Livers v. Schenck*, 700 F.3d 340, 354 (8th Cir. 2012) (quoting *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) (*en banc*)).

201.    As a direct and proximate result of the acts and omissions of Defendants McCarver and LaLuzerne in violating Plaintiff's due process rights, Plaintiff suffered the items of damages as alleged herein in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

202.    Punitive damages are available against Defendants McCarver and LaLuzerne and are hereby claimed as a matter of right under federal common law, *Smith v. Wade*, 461 U.S. 30 (1983), and therefore are not subject to the pleading standard set forth in Minn. Stat. § 549.20.

203.    Plaintiff is entitled to recovery of his costs, including reasonable attorney's fees, under 42 U.S.C. § 1988.

## COUNT VI – CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST DEFENDANTS LALUZERNE AND MCCARVER

204.    Plaintiff realleges and incorporates herein by reference the allegations in the preceding paragraphs of this Complaint against Defendants LaLuzerne and McCarver as if set forth herein in their entirety.

205.    By the conduct described above, Defendants LaLuzerne and McCarver conspired to violate Johnson's civil rights. Said conspiracy consists of, inter alia, falsely arresting Johnson and creating a justification for his arrest through their false reports and testimony, all in an attempt to deprive Johnson of his well-settled Fourth Amendment rights to be free from false arrest and unreasonable seizure and to prevent Johnson from filing a civil lawsuit.

206.    The facts demonstrate that McCarver and LaLuzerne reached an agreement or "meeting of the minds" to violate Johnson's Fourth Amendment rights.

207.    Defendants LaLuzerne and McCarver both performed at least one overt act in furtherance of the conspiracy, including their actions in tasing and arresting Johnson and then falsely reporting about - and falsely testifying about - Johnson's actions.

208.    As a direct and proximate result of McCarver's and LaLuzerne's actions in concert, Johnson suffered injuries as set forth herein and was damaged in an amount exceeding Seventy-Five Thousand Dollars ($75,000)

209.    Punitive damages are available against Defendants McCarver and LaLuzerne and are hereby claimed as a matter of right under federal common law, *Smith v. Wade,* 461 U.S. 30 (1983), and therefore are not subject to the pleading standard set forth in Minn. Stat. § 549.20.

210.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. §1988.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Tom Johnson prays for judgment against the Defendants as follows:

1.     As to Count I, a money judgment against Defendants Patrick McCarver and John LaLuzerne for compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000) Dollars and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorney's fees under 42 U.S.C. § 1988, and prejudgment interest;

2.     As to Count II, a money judgment against Defendant City of Minneapolis for compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000) Dollars, together with costs, including reasonable attorney's fees under 42 U.S.C. § 1988, and prejudgment interest;

3.     As to Count III, a money judgment against Defendants Patrick McCarver and John LaLuzerne for compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000) Dollars and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorney's fees under 42 U.S.C. § 1988, and prejudgment interest;

4.     As to Count IV, a declaration that Defendants' conduct violated the Minnesota Human Rights Act and money judgment against Defendants for all amounts owing under the Human Rights Act in an amount in excess of Seventy-Five Thousand ($75,000) Dollars, including liquidated damages and attorney's fees under Minn. Stat. 363A.33 subd. 7., and prejudgment interest;

5.     As to Count V, a money judgment against Defendants Patrick McCarver and John LaLuzerne for compensatory damages in an amount in excess of Seventy-Five Thousand

($75,000) Dollars and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorney's fees, and prejudgment interest;

6.    As to Count VI, a money judgment against Defendants Patrick McCarver and John LaLuzerne for compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000) Dollars and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorney's fees under 42 U.S.C. § 1988, and prejudgment interest.

7.    For injunctive relief against Defendant City of Minneapolis, including the appropriate imposition of discipline against Defendants McCarver and LaLuzerne for their actions in this matter, changes in the policies and procedures of the Minneapolis Police Department, including policies with regard to use of tasers by off-duty officers, and for an Order requiring the City of Minneapolis to properly investigate use of force incidents and impose discipline for the use of excessive force, false arrest and unreasonable seizure so that its custom, pattern and/ or practice of unchecked constitutional violations by its officers is stopped; and

8.    For such further relief as this Court deems just and equitable.


Dated: March 29, 2016                    PRITZKER OLSEN, P.A.


                                         _____
                                         Eric Hageman (MN# 258180)
                                         Lindsay Lien Rinholen (MN# 397560)
                                         Attorneys for Plaintiff
                                         45 South Seventh Street
                                         Plaza VII, Suite 2950
                                         Minneapolis, MN 55402
                                         Phone: 612-338-0202
                                         Fax: 612-338-0104
                                         eric@pritzkerlaw.com
                                         lindsay@pritzkerlaw.com